UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VICTOR ENCARNACION, KALEB HAGOS,
KENNETH CLAVASQUIN, and
THE BRONX DEFENDERS, individually and
on behalf of a class of all others similarly
situated,

                Plaintiffs,

– against –

THE CITY OF NEW YORK,

                Defendant.

16-cv-156 (DLC)

## DECLARATION OF NIJI JAIN

I, Niji Jain, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a staff attorney in the Impact Litigation Practice at The Bronx Defenders (BxD), located at 360 East 161st Street in the Bronx, New York. I am counsel to the plaintiffs in this action. I am admitted to practice law in the State of New York and in this Court.

2. BxD is a public defender non-profit that represents more than 20,000 low-income Bronx residents annually in criminal, civil, child welfare, and immigration cases.

3. I have been Plaintiffs' counsel in this matter since March 2017. I submit this declaration based on personal knowledge gained through the ordinary course of my role litigating cases and my review of BxD's records.

4. In the first year after the settlement was ordered by the Court, the NYPD informed Plaintiffs' counsel that it had conducted training efforts on voucher delivery. After these trainings concluded, Plaintiffs' counsel sought to assess compliance with the voucher delivery obligations. We asked Defendant—specifically, the Assistant Corporation Counsels assigned to represent the City and the NYPD representative who attended our settlement working

group meetings—to share information or data regarding compliance or voucher delivery rates. They declined to do so, instead asking Plaintiffs to provide examples of people not receiving their vouchers.

5. Using the tools and information accessible to BxD, we developed and fielded a survey in January-February 2019 regarding voucher delivery during arraignments. See Exhibit A, Voucher Survey Form. We collected over 100 responses from individuals who had property seized during their arrest. Of those, 48% did not receive adequate vouchers. Specifically, 38% did not receive a voucher at all for their seized property, and 10% received a voucher that lacked the required notice provisions which provide instructions on how to request the release of seized property.

6. We shared this information with the City and informed them that the NYPD was not in compliance with the settlement via the requisite procedures under the settlement, and the parties convened a meeting of the "working group" and exchanged correspondence and information. The City complained and sought clarifications about the methodology of our survey. In response, we provided additional information and conferred extensively with the City. We have also asked the City what data would be acceptable, and they have refused to offer an alternative to date.

7. Through the survey and follow up investigation, we identified evidence of failures on three counts: (1) failure to create a voucher, meaning the NYPD seized an individual's property and failed to document the seizure in any way; (2) failure to provide a voucher, despite the fact that the NYPD created the voucher and it was available in the database where vouchers are maintained; and (3) failure to provide a complete voucher that includes the required notice provision page with instructions on how to retrieve property that has been seized.

8. Following the results of our first survey, the NYPD said that it conducted additional training for officers regarding vouchering procedures.

9. Subsequently, over a similar time period in October-November 2019, BxD fielded another survey to collect updated data regarding voucher delivery during arraignments. Of the 59 people surveyed who had property seized during their arrest, 34% did not receive vouchers at all.

22% received partial vouchers (meaning that either they only received vouchers for some of their property, or all the items were vouchered, but the required notice/instructions page was missing). In other words, 56% of people either did not receive any voucher or received an incomplete voucher. The deficiencies were distributed across NYPD precincts.

10. These surveys are burdensome and time consuming to field and analyze. Arraignments are often a high stress situation for a client who has just been arrested and whose release or bail is about to be decided, all while meeting their attorney for the first time--and very briefly. It is difficult and time consuming to gather extensive additional information from a client about the paperwork they did or did not receive during their arrest processing.

11. Following the second survey, we shared the results and suggested to the City that they implement reforms to improve their performance on voucher delivery. *See* Exhibit B, Letter from Plaintiffs to Defendant dated December 2, 2019. For example, we proposed that the City:

  a. Implement a separate, monthly NYPD Quality Assurance Division (QAD) audit focused on whether officers are (a) creating vouchers for every property item that is seized; and (b) delivering complete vouchers to every claimant; and share the results of the QAD audits and information about subsequent remedial measures with Plaintiffs' counsel.

  b. Implement disciplinary measures for individual officers who fail to create and/or deliver vouchers, as identified in QAD audits or through other complaints, and/or note failures in performance evaluations.

  c. Place a computer with access to the NYPD's voucher database (the Property and Evidence Tracking System, called PETS) in the courthouse complaint room or on the arraignments floor, to facilitate printing and delivery of a voucher (either upon someone's release or through delivery to their attorney) if it was not timely delivered prior to arraignments.

  d. Ensure that vouchers are provided to the Bronx DA in the complaint room and request that Bronx ADAs provide a copy of all vouchers to defense counsel as part of the standard paperwork exchanged during arraignments.

12.     The City declined to take any of these actions but agreed to extend the settlement twice; first through June 30 and then again through October 31, 2020.

13.     As part of the parties' ongoing collaboration through the Working Group, Plaintiffs regularly inform the City of ongoing issues with voucher delivery. When confronted with instances where people did not receive vouchers—sometimes despite affirmatively asking an officer for their copy—the NYPD has passed off its responsibility and suggested that people file Internal Affairs Bureau complaints.

14.     During the parties' Property Working Group meeting on August 26, 2020, an NYPD representative informed us that with respect to vouchers, the NYPD has "not taken any affirmative steps since we did the trainings."

15.     The NYPD further confirmed that it has "not really been monitoring compliance because [we] don't really have a way to."

16.     The City has previously suggested to us that two anticipated events could collectively improve voucher compliance: (1) the anticipated introduction of a second generation of the PETS voucher software and database, which Defendant represented would incorporate additional safeguards to ensure the issuance and timely service of vouchers, and (2) the implementation of changes to the New York State criminal procedure laws.

17.     Based on Defendant's explanation of the planned changes to the voucher software and resulting efficiencies and improvements to the vouchering process, we believed that the introduction of the new PETS software could substantially improve the NYPD's compliance with its voucher obligations, but we would need time to assess its impact once the system was up and running.

18.     During the parties' Property Working Group meeting on August 26, 2020, the City informed us that the development of the new PETS voucher software has been put "on hold" indefinitely and the new system will not be introduced in the near future.

19.     The COVID-19 pandemic has frustrated the parties' ability to assess any impact from the criminal legal reforms implemented earlier this year, including in part because the

physical offices of BxD have been closed, arraignments are being conducted virtually such that Plaintiffs' counsel would have far more difficulty conducting the survey, and for a period, the volume of arrests was down, which greatly constricted the pool that could be surveyed.

20. In light of these changes, challenges, and ongoing difficulties, Plaintiffs recently requested that Defendant again agree to extend the Settlement to give the parties time to continue negotiating and collaborating toward a solution. Defendant refused to consent to another extension.

Dated: October 29, 2020

_____
Niji Jain
THE BRONX DEFENDERS
360 East 161st Street
Bronx, New York 10451
(718) 838-7878

5